May it please the Court, Mark Lemley on behalf of Ramar. This is a cross-appeal, Your Honor, and with your permission I would like to hold ten minutes and discuss our appeal now and then wait on the cross-appeal until after Mr. Gabriel's had his say, but of course I'll talk about whatever you want me to talk about. Ramar has been selling ice cream under the Magnolia brand and logo in the United States for over 40 years. San Miguel has repeatedly tried to sell ice cream and other foods under the identical name and the identical logo. Every court and every PTO decision, and there have been four, to have considered the issue has found that San Miguel's sales under the identical mark confuse consumers. So did the District Court here, finding as a matter of law that San Miguel was confusing consumers. Notably, San Miguel does not appeal that finding and it is the law of the case. Nonetheless, the District Court limited the scope of the injunction, concluding that because San Miguel had gotten away with selling butter, margarine, and cheese products under the Magnolia brand for several years, it was protected by laches and could continue to sell those products despite consumer confusion. The District Court's laches decision should be reversed and its injunction expanded to cover butter, margarine, and cheese for two reasons. First, San Miguel is a willful infringer and willful infringers cannot take advantage of the equitable doctrine of laches. The jury found to the contrary, but the jury was misled by an erroneous jury instruction. The jury instruction adopted by the court at San Miguel's insistence departed from this court's model jury instructions and asked whether San Miguel, quote, intended to deceive consumers, unquote, allowing them to try to show their belief in the rights to the mark as good faith. In fact, however, the law properly asks whether San Miguel intended to use a mark that it knew infringed. The difference here is knowledge of infringement versus purpose to infringe and in particular purpose to deceive consumers. In departing from the Ninth Circuit model jury instructions and adding an intent to deceive consumer requirement, the District Court departed from other district courts and erred. We think at the bare minimum that requires a new trial on willfulness under the correct standard. May I ask a question? Your Honor. Go ahead. Does the record show why Ramar waited so long to object to the San Miguel's use of the label on butter, margarine, and cheese? How could San Miguel's infringement be willful if San Miguel knew that Ramar knew of the products and didn't object? So the simple answer, Your Honor, is that we didn't know. We brought suit as soon as we found out about the sale of butter, margarine, and cheese. There's a long and torturous history of the facts here. We challenged San Miguel in the 1990s on ice cream and won in the trademark office and they stopped selling ice cream. We sued their distributor on ice cream and we won. San Miguel sued us in the 1990s to try to get proof that it owned the mark. It dropped that lawsuit. We found a distributor in the 1990s who was distributing butter, margarine, and cheese. We sent them a cease and desist letter saying, hey, you can't do this. They stopped and we thought that was the end of it. The first time we found out about the butter, margarine, and cheese was in 2009 when Susie Quesada was sent information about various of the products. Her testimony was that, quote, we were absolutely stunned to find BMC products, quote, we just couldn't believe it because I feel like we've been through this with them before. So we tried to stop not only ice cream but butter, margarine, and cheese. We thought we had succeeded. Now San Miguel's, the evidence in San Miguel's testimony is that their distributors came to them when they started selling sometime in the 2000s and they said, let's ask Ramar if they object. And San Miguel said, no, no, no, let's not do that. Let's kind of sneak it into the market and see if we can get away with it. Now the district court found that we should have known, that we should have found these things in the store. We do not contest that finding for purposes of this appeal. And that was the basis of the district court's laches finding. We should have, the court found we should have known but the fact is we didn't know. When we knew, when we found out about it, we took action. Nonetheless, to show laches, San Miguel has to demonstrate that it was not a willful infringer. The fact that the jury was improperly instructed on willful infringement, at a minimum I think requires a new trial on the willfulness question because if they're a willful infringer, they can't take advantage of the laches defense. But I think this court can actually go further. Once you conclude that the right legal standard is not purpose to deceive consumers but did you know that there was infringement, there's overwhelming evidence in the record from which we can conclude that they knew that they were infringing. They've known for over a decade they don't have the legal right to sell Magnolia ice cream and related products in the United States. They've tried time and again to persuade courts and the PTO to let them sell under the Magnolia brand and they've lost every time. By January 2012, they'd affirmatively lost a ruling in the Patent and Trademark Office that their butter, margarine and cheese products were confusingly similar to our ice cream. They didn't appeal that ruling and yet they continued to sell butter, margarine and cheese. How did your client come upon the Magnolia name and the trademark they used? Your Honor, we adopted the Magnolia name in the early 1970s. Where did it come from? They liked a certain kind of trees? No, Your Honor, it came from the fact that there was a Magnolia product in the Philippines starting in the 1920s and that product was not available for sale here. So my clients who were Filipino immigrants adopted the mark because they were selling ice cream products that had flavors that reminded Filipino immigrants of the flavors they could get at home. And the products were mostly being sold to people who were familiar with that trade name and that trademark because they'd come from the Philippines? I think it's fair to say that at the outset that was true.  Over 40 years, we have built a brand. That is, I think that fact gives rise to the 25-year-old- That flavors a lot about this case, doesn't it? Well, it does, Your Honor, in the following sense. So as a matter of law, it's completely irrelevant. This, the trademark- Well, there is, this court recognizes a famous foreign mark. I wouldn't say it's completely irrelevant. That's true, Your Honor, but it was established both in the patent office and in the district court that they did not qualify, as of our first use in 1972, for that foreign mark. They have not contested that issue on appeal. Trademark law is a territorial right. There was no use by them in the United States in the 1970s when we adopted this mark. And so from our, from the perspective of the law, we are the first user in the United States and we're the people with- A lot of your arguments are based on confusion, avoiding confusion. A consumer ought to be the hallmark and disregard almost everything else. And yet, in fact, this mark started with an effort to capitalize upon their name and mark to an audience that knew their name and mark. And so a little pot calling the kettle black here, isn't there? I think it's a fair concern, Your Honor. I will say that the law, because it is territorial, permits this to happen. And it happens with some frequency. Budweiser beer is beer whose name is copied from the Czech Budweiser. And in Europe, if you want to buy a Budweiser, you have to buy it from the Czech company, not from the United States. Nonetheless, Budweiser has built a brand in the United States and so has Ramar. And the evidence in court shows that Ramar has expanded beyond the Filipino community, that it's in over 2,000 stores, including basic stores, basic grocery stores that cater well beyond the immigrant community. And during that time, San Miguel has not lawfully been able to sell products in the United States at all. So for 40 years, the only experience people have had in the United States with Magnolia foods has been with our ice cream. To follow up on Judge Clifton's question, in fact, didn't the district court find that the carve out or the use by the other side of Magnolia on what is the butter, cheese and something else, margarine, margarine, you know, wasn't injurious, injurious to San Miguel, right? No, Your Honor. In fact, it probably helped you. No, Your Honor. In fact, they found the district court found the opposite. In granting an injunction, the district court specifically found that there was irreparable injury to our goodwill. And that there's abundant evidence to support that conclusion. There's evidence in the record of actual confusion. There's multiple instances of actual confusion by consumers who think that their products come from us. There's evidence of confusion on websites that talk about one as if it were the other. There's evidence that food experts were confused. The people who are actually studying and writing about these products couldn't tell them apart. And that confusion helped you. No, Your Honor, it didn't help us. And it didn't help us for a number of reasons, the most fundamental of which in trademark law is we've lost control of our mark. We don't have any control over the quality of the products they produce. As it happens, the quality of the products they produce are inferior. We say butter, margarine and cheese euphemistically, but they're essentially non-dairy products. Their ice cream is not actually ice cream at all. It's so-called melarin made from oils rather than from cream. And so when consumers think they aren't selling that under Magnolia, are they? They have been, Your Honor, at various points anymore. And that's not protected by the carve out. That's correct. The injunction as it currently stands bars them from selling ice cream, although I will note that they have repeatedly violated that injunction since it was issued and they were found in contempt last year for doing so. That's a different issue. I don't think it's before us. Your Honor, I think it could be before you simply because they've tried to make the claim that you can eliminate the injunction and no harm will come. We won't expand the products. That claim is belied by their very actions in this case in willful defiance of the injunction. I also think it can be evidence that they are, in fact, a willful infringer. It's not just that prior PTO decisions and prior court decisions that told them they were infringing demonstrate their willfulness. It's the fact that they chose to ignore not only those decisions, but they chose to ignore the district court's injunction here and to repeatedly bring products into the United States, multiple different types of products, even after they were told not to do so. With the court's permission, I'll hold my time for the cross. Your 10 minutes. Thank you, Your Honor. And we'll hear from Sam Miguel. May it please the court, Your Honors, Alan Gabriel representing the Sam Miguel parties. First of all, I would urge the court, and I don't want to take my time to go through it now, to carefully review the record, which is discussed in detail in the briefs, because my opposing counsel has made references to many, many claims and facts, none of which are in the record. I just want to cite the court to one example, which is addressed in the briefs. There's a statement about the quality of the products sold by Sam Miguel are inferior. In fact, the district court granted a motion in limine to preclude any evidence or testimony regarding the quality of any product. So for a counsel to represent that the record is full of evidence in that regard is simply incorrect. Some other incorrect statements. Very briefly, Sam Miguel never, ever, ever sold ice cream in the United States, ever. So there's a reference to they've been selling ice cream. They were told to stop selling ice cream. Not true. Not true. So, again, I don't want to take the time. They sell something that looks like ice cream, allegedly tastes like ice cream. Under another brand, Your Honor. Well, that's Sam Miguel. I mean, you can tell me that Magnolia is being used. You said Sam Miguel doesn't sell ice cream and they do. Under the, excuse me, correct, Your Honor, under the Magnolia mark, the mark that there was infringement found by the district court. My point is when there's references being made to the record is replete with instances where Sam Miguel was selling ice cream under Magnolia. That's not true. Now, let me go to the whole issue of, and it's all been conflated by counsel's argument. What are we really looking at here? First of all, we're looking at a dispute over what willfulness means in the context of trademark infringement and a criticism of the district court's jury instruction as it relates to willfulness. Well, several points about this. First of all, the whole discussion of the state of the law of willfulness as represented by Ramar is simply not the law in the Ninth Circuit. It's very clear in the Ninth Circuit, and we've discussed this in detail in our brief, that willfulness, intentional infringement, involves a state of mind. And as the comments to the form jury instruction explain in detail, that state of mind relates to things such as, was there an intent to deceive? Was there bad faith? Were there false and fraudulent statements made in connection with an effort to deceive the public? That is, in fact, the law. The argument that Ramar is making is this is some kind of elevated, heightened standard of willfulness. Let me ask a question about that. Is the intentional infringement jury instructions accurate to the extent it states a factor type analysis? The district court said it based the instruction on the comment to the model jury instruction, but the factor type analysis is not in the Lindypan case. What case is the instruction based on? It's based on, let me give the court an example. In Seeley versus Easy Living, 743 F. 2nd, 1378, that's a Ninth Circuit appellate decision that found that a court could find infringement based upon the fact, willful infringement, that infringement was willful and deliberate based upon a bad faith infringement that was intended to, and in fact, resulted in deception to the public. Is that a mean or brief? I believe it may be, Your Honor. If it's not, I apologize. All right. And I'm referred. If it's not, I suggest that you submit a slip to the court and to your opposing counsel citing that case. I will, Your Honor. I'm reading directly from the comment to 15.27, which is the form, Ninth Circuit form jury instruction, trademark infringement, intentional infringement. Lindypan is mentioned. It's very clear from the cases we did put in our brief that the district courts have discretion to explain what the form instruction means. In fact, there were cases that stand for the proposition, it's error in certain circumstances for the court not to make clear to the jury that knowing something is or intentional infringement is more than you intended to do the act. The other point on the jury instruction is where's the prejudice? There's no argument being made about prejudice. It's not erroneous because in fact, what was added by the district court in that additional instruction, there's no argument being made that those were not issues in front of the jury. In order for a jury instruction to be reversed on appeal, it's not simply an argument that it was erroneous, which it wasn't. It was totally consistent with Ninth Circuit law. Where's the prejudice? Noticeably absent from the brief of Remar is any argument pointing to here's exactly how we were prejudiced by an intent to deceive element or factor in the additional jury instruction. Now, why is that missing? Because there's no argument being made that wasn't an issue in the case. And in fact, as we point out, the district court judge repeatedly reminded the jury, this is a case about state of mind. Was there a reasonable basis for the San Miguel parties to believe that they weren't infringing? The argument being made on the law here essentially boils down to, well, if somebody complains that you're infringing one time, the district court must infer and take away from the jury any question about willfulness. That's simply not the law. That would mean in every single case, when there's any argument being made that there was a cease and desist letter or some notice given, if the purported infringer disagrees that the district court must, as a matter of law, determine, well, it was willful. Somebody told you and claimed you were infringing. That's simply not the law. What about the lack of success before the trademark office? Those were applications to register. First of all, the argument is over ice cream, not butter, margarine, and cheese. And all of that is dealt with not butter, margarine, and cheese. The evidence, by the way, totally ignored by Ramar in its appeal. When we look at the willfulness issue and we look at whether the judge's refusal to grant a JMLL at the close of plaintiff's evidence or after the jury verdict on the case, we start with a standard of appeal. All inferences in favor of the non-moving party. And was there substantial evidence to support the jury verdict? What Ramar has shown in Ninth Circuit, your honors, in its appellate brief is, here's all the evidence that supported our position. Well, that's not the test. What about the substantial evidence that supported the position of the San Miguel parties? There's no discussion of that. We have seven pages of that in our answering brief. There clearly was substantial evidence to support the jury's determination as to it was not willful infringement. Evidence from all the San Miguel parties addressing whether there was an intent to deceive, why they had a reasonable basis to believe that they weren't infringing. Now, let me address the whole question of, which was brought up, latches and why didn't San Miguel, why didn't Ramar do anything? Ramar never, ever, ever objected to the sale of butter, margarine and cheese for a period of over 10 years until it sent a cease and desist letter in 2011. This is while these products were not only sold to the same customers, they were in the same markets. You had an aisle where there was Ramar's ice cream and a refrigerator section in the same store, which had the San Miguel, magnolia, butter, margarine and cheese. That's why the district court concluded Ramar should have known. We're not talking about a remote interaction. The evidence was overwhelming. These products were in exactly the same markets, virtually next to each other. For a period of years, there were trucks parked in the parking lots of those markets, having the magnolia logo of Ramar, the other truck having the magnolia logo of the U.S. distributors of the San Miguel butter, margarine and cheese. There was testimony by the people who came to the same markets and serviced those products, where a Ramar representative spoke to a representative of San Miguel's distributor in the U.S. So the question about why didn't they do anything, they knew. The answer to why they didn't do anything, as indicated in the discussion with the distributors, was that there was evidence that they didn't do anything. In fact, there was evidence and it helped. Here's another reason, an undisputed reason why they didn't do anything. The products were not competitive. These are not my words. This is not San Miguel's argument. This is the testimony of Ramar. Ramar testified at trial. These products don't compete. So that's why nothing was done. Of course it helped. The more magnolia branded product, the better. But there's no evidence of confusion, which Ramar's counsel just represented was in the record. There's no overwhelming evidence of confusion in the record. The only evidence of confusion was an inquiry, one inquiry, where somebody asked somebody from Ramar, do you make this cheese ball? Is this from you? That is the evidence that relates to so-called confusion. Nothing else. There's nothing else in the record. And yet, wouldn't you anticipate confusion? Well, I think you just talked about how they're in the same market, sometimes the same aisle. Is it likely that a consumer is going to figure out the difference between them? Well, here's the answer, Your Honor. Yes, you might anticipate it. Why wasn't there any? Over those dozen years. Is there any affirmative evidence that there wasn't? Well, there was no evidence that there was. I understand that. But it seems to me it's not a hard proposition to infer. No, but Your Honor, my point is, I'm not arguing likelihood of confusion. We're not appealing the infringement determination on summary judgment. My point is, when you ask why didn't Ramar do anything, I'm simply indicating there was evidence in the record for why it didn't care. There's evidence about Ramar being okay with it, as long as it's not ice cream. There's evidence in the record of the same people showing up in the same stores representing each company and talking to each other about how's your product doing. I'm not arguing about whether there was a likelihood of confusion with respect to infringement. I'm simply answering the inquiry, why didn't Ramar do anything? The answer is because the products, according to Ramar, didn't compete. That's the explanation for why they didn't do anything. Let me address two other items, which one is the injunction issue here. The court issued an injunction prohibiting the use of magnolia, the term magnolia, for all food products. And this is part of our cross appeal, but it also relates in part to the appeal of Ramar. First, Ramar is saying there should not have been a carve-out from that injunction for the product that had been sold for 15 years, the butter, margarine, and cheese. Now, Ramar's got a problem because Ninth Circuit law is clear. Latches can trump any basis for injunctive relief, prospective injunctive relief, except for one circumstance, the public safety circumstance, which is the law in the Ninth Circuit, crystal clear. So Ramar concedes in its brief, it's asking this court to overturn precedent, recognizing that that's an issue better left to an en banc panel. That's the issue of should this court eliminate the carve-out. And the answer is no, there's no evidence of any public safety issue at all in the case, which we pointed out in the brief. But the other problem and the cross appeal relates to the position of San Miguel that look at what happened here. The entire trial was about butter, margarine, and cheese. The district court first entered an order that said, in connection with injunctive relief, magnolia can't be used for anything, period. In the post-trial motion, San Miguel pointed out to the district court, well, that makes no sense, how can the court issue a prospective injunction prohibiting the use of magnolia for shoes or any other product? There's no evidence, there's no basis to determine anything about any confusion. It's an overbroad, unsupported injunction in fact and law. The district court, in responding to that motion, decided to limit the injunction to all food products, which now means that there's an injunction in place that prohibits the use of magnolia for champagne. On what basis, under the traditional elements necessary for a court to issue injunctive relief, including the eBay and Herb Reed elements, could the district court brown that decision? The answer is there's none. First, we start with the proposition that Herb Reed, adopting the eBay four-factor test for injunctive relief for trademark infringement, is required to go through the four-element analysis, including under Herb Reed, was there past irreparable harm, past irreparable harm? How could there be past irreparable harm to support an injunction that prohibits the sale of, among other things, champagne, caviar, without any analysis whatsoever? The injunction on its face doesn't meet the requirements necessary for any trademark infringement injunction. And we've briefed this in detail in our answering and opening brief on our cross-appeal. The point being, the district court ignored the dictates of the eBay Supreme Court decision as applied by Herb Reed, which is now Ninth Circuit law, cert denied by the U.S. Supreme Court, and simply issued an injunction without any analysis at all, except to say, well, there could be a problem. This could happen. That's not the test for injunctive relief for trademark infringement in this circuit under the governing law of not only the U.S. Supreme Court and eBay, but under the Herb Reed decision, which says, no, no, no. That old view of injunctions in trademark cases, well, trademark infringement is kind of automatic. You know, you lose control of your reputation, potentially, so we're going to issue a permanent injunction. That's not the test. No longer. So what the court did was, and we went through the four elements, balance of the hardships, injury to the public, et cetera, and pointed out, each time the district court tried to discuss it and justify it, there was no basis whatsoever for the issuance of that injunction. It also creates a First Amendment problem. Literally as written, that injunction prohibits San Miguel from saying something as simple as our products are not the Magnolia products sold by Ramar in the United States. It can't even explain the distinction between the companies. Now, Ramar's brief says, well, gee, we waived that argument. There was no opportunity to make it because the judge issued an order that broad after ruling on the post-trial motions. So our first attempt to even address it is in connection with this appeal. But again, just to circle back to what's the argument on the cross-appeal? The argument is there's an injunction in place dealing with a universe of hypothetical products that was never litigated. There was no opportunity to address any of the issues related to support for an injunction. And the principles that govern the propriety of issuing an injunction for trademark infringement were ignored by the district court, which only said, well, because this could happen, might happen, there might be confusion, there might be harm, there might be an issue, issue an injunction for all food products. Well, I don't have to take more than 30 seconds to explain there's a difference between a Philippine food product and champagne or anything else. The requirement for showing past irreparable harm was not met, and even independent of that, the injunction is overbroad, there's no basis for it, and that should be reversed. I'll reserve my two minutes and 52 seconds, if I may, in response to opposing counsel. Your Honor, if I may, since I've been accused of misrepresenting the record where there is no evidence, I'd like to actually point you to the evidence. So, Mr. Gabriel starts out with a strong statement that says, they never sold ice cream in the United States, there is no evidence in the record. That is simply factually false. I direct you first to excerpt of record 476, which reads as a declaration in summary judgment that reads, on or about September 22nd, 2009, I spoke with Anthony Gonzalez, a Ramar salesperson in Los Angeles area. Mr. Gonzalez informed me that he found a Mellorin ice cream product with the Magnolia mark embossed on the bottom of the tub made by San Miguel. Mr. Gonzalez became aware of the product because an employee at a Seafood City supermarket in Los Angeles mistakenly stocked San Miguel's Mellorin product in the freezer space allocated for Ramar's Magnolia ice cream product. Mr. Gonzalez also told me that he saw a corrugated box containing the San Miguel gold label Mellorin product that displayed our identical Magnolia mark. He asked, we asked him to send pictures. The pictures are attached and in the record. ER 477, we'll continue to investigate. This was what actually caused us to find that there was infringement going on. In 2009, I reviewed SMC's website and saw a statement that Magnolia ice cream now in the United States and Canada, Magnolia ice cream recently launched. In 2009, they were selling ice cream using the Magnolia label. There is a specific finding by the district court and that's at ER 406 that specifically holds, specifically finds that in September 2009, defendant discovered that San Miguel's other brand ice cream products were still being distributed in shipping boxes with Magnolia logo and the bottom of the ice cream tubs had an embossed Magnolia label. It is simply not true to say they never sold ice cream in the United States. It is also simply not true to say that there was no evidence. Consumers are looking for the embossed seal on the bottom of a carton. So, your honor, I think the answer is because they think that they, since they sell in the Philippines, they should have the rights in the United States, even though they have been told repeatedly by courts in the PTO to the contrary. They're doing everything in their power to try to sneak the Magnolia label in and to attach it to their products. Do you think many consumers are picking up the cartons and looking for an embossed seal on the bottom? What I think, your honor, is that many consumers are, in fact, confused. So, the second claim in which Mr. Gabriel says there's no evidence is there's no evidence of actual confusion, that's simply not true. There's abundant evidence of actual confusion in the record. There's evidence, multiple evidence of consumers who confuse the two. So, you can look at the court's finding on that respect at ER 406. You can look specifically at the evidence at ER 455, at ER 456, and the reply excerpts of record at 629 to 631. There's evidence that websites confused the two, and that's in the record at ER 455. There's evidence that food experts confused the two, ER 340 to 42, ER 455, and reply excerpts of record at 624. And there's even evidence that intellectual property lawyers couldn't tell the two apart. The reply excerpts at 626 to 627 is an article in an intellectual property magazine talking about how after their brand had lapsed for many years, they were bringing it back and pointing to our advertising of ice cream in the United States as evidence of that. So, there's abundant evidence of confusion, and I think that abundant evidence of confusion extends not just to ice cream, it extends to the other products. We got a- Any evidence whatsoever that somebody bought, what's it, gold label ice cream based on the Magnolia trademark embossed on the bottom? Your Honor, what we have is evidence that they- I mean, I accept confusion as nearly a given because the name and marks are-the name is identical, the marks are virtually so, but I'm not sure what point you're making. Well, Your Honor, the point we're making is there's consumer confusion here, right? It is, as the district court found, it's hard to imagine how there couldn't be consumer confusion. That confusion injures us because it takes away our goodwill. It injures consumers- Or it helps you because you're-let's face it, your client is surfing on the goodwill established 40 years ago. Now, it may have developed the brand past that, but it's not like they think the Magnolia trademark used by somebody else is a drag on them because they picked it up from San Miguel's usage in the first place. I think, Your Honor, at this point, it is actually a drag, but I also think that trademark law is pretty clear that they don't get to make that choice for us, right? That the point of trademark law is not to say, well, they sold- But you don't get to assert that your client is injured just based on your client's say-so. No, Your Honor, and that's- And I haven't seen a whole lot of evidence that your client's been injured by it. Well, Your Honor, the evidence found by the district court was there was actual confusion here. There were multiple evidence of actual confusion. Yes, and where's the injury resulting from that? If the customers don't think that Magnolia, as used by San Miguel, is an inferior brand, what's the harm to your client? The harm to our client, Your Honor, is that we lose the control over the goodwill of our mark, and that's precisely the harm- What's the harm? In reality, you lose the goodwill, but if the goodwill is a positive, if customers think that Magnolia is a good brand and their product, too, this is all theoretical about losing control over the mark. But, Your Honor, I think that's precisely what trademark law is about. Trademark law is about cementing the connection in the minds of the consumer between the product and the source, and if we eliminate that connection, right, if it now means, I don't know whether this product comes from San Miguel or Ramar, consumers lose that connection, and Ramar loses that connection. Ramar can't reap the benefits of its goodwill. It's at the mercy of whether San Miguel sells good products or bad products, and when they sell moldy cheese, we're the ones who get blamed for it. That's precisely the kind of injury that trademark law is designed to resist. Mr. Laemmle? Yes, Your Honor. You don't have too much time left. Let me turn to one part of the cross-appeal. Let's start with the assumption that, you know, you've proved that there's sufficient evidence of actual confusion. Now, you need to show more than that in terms of irreparable injury to sustain the grant of an injunction? Your Honor, the court suggested in the Herb Reid case the four eBay factors apply here for the grant of the permanent injunction. The district court made specific findings on each of those eBay factors. It made a finding that we suffered irreparable injury because our goodwill was taken away and couldn't be taken back, that that was not compensable in monetary damages. It made a specific finding that Ramar, unlike San Miguel, has actually made a substantial investment in the goodwill of the Magnolia brand in the United States over the past 40 years, and that that goodwill would be destroyed. Because San Miguel hasn't made that comparable investment, the balance of the hardship specifically favors us. Finally, it found that the public interest favored Ramar because, as the court said in Wetzel's Pretzels, quote, the public interest at stake is the right of the public not to be deceived or confused. And there is no question at all that there is likelihood of confusion. There is a finding as a matter of law by the district court in summary judgment. They do not appeal that finding, and it is the law of the case. Consumers will be confused. That's what I said. We'll start, you know, that substantial evidence to support the finding that there is actual confusion. Yes. But I'm not so sure that's enough to sustain, you know, a finding of irreparable harm. Well, Your Honor, I would say two things. The first is that I think it supports at a minimum the findings of the balance of hardships and the public interest factors. The other factors. And eBay does not say if no irreparable harm, no injunction. eBay says the contrary. eBay says you've got to consider all of the four factors as a whole. That said, I think it does support a finding of irreparable injury. In this court's Reno Air Racing case, which is the only case that's actually held on the question of a permanent injunction, the court pointed to evidence of confusion as its only evidence of irreparable injury. Now, there is a single sentence of dictum in the Herb Reid case, which is about preliminary, not permanent injunctions, that says you must show irreparable injury. But I don't think that the court intended in that dictum to overrule eBay, to overrule Reno Air Racing, and to say that if there's no proof of irreparable injury, you automatically lose. In any event, there is proof of irreparable injury. All of the evidence of actual confusion, of people buying their products, thinking they're ours, of congratulating us on their products or congratulating them on our products, that's all evidence that our goodwill, our rights in the mark are being taken away. You don't have rights in the mark where you haven't used the mark. You don't have rights in shoes, to use the extreme example. So that's right, Your Honor, but the court... How about champagne? They use champagne. Do you have rights in champagne? We have not used it in champagne, but trademark law extends beyond the specific product you have used to cover products likely to confuse consumers. And the Patent and Trademark Office specifically found that San Miguel's use of butter, margarine and cheese was likely to confuse consumers. That finding was not appealed. But the injunction doesn't cover those products. Because of latches. What about the products that the injunction does cover? So, chocolate, there was evidence of chocolate confusion. That was the product being sold. I would note that they raised for the first time this argument that we shouldn't be allowed to enjoin other food products likely to confuse consumers until they actually sell them and confuse consumers. That's anathema to the trademark law, Your Honor. Trademark law has quite specifically held the contrary, that there's a safe distance rule, that once you've been found to infringe, we're going to protect consumers against infringements or possible infringements that are in similar areas. Now, the district court originally granted a quite broad injunction. They asked for that injunction to be narrowed and they got that injunction to be narrowed. Now, they want that injunction to be eliminated altogether so that they can sell ice cream, so they can sell chocolate or any new product. Well, they conceded there should be an injunction when they thought it should be narrowed. In their first brief, they did that, Your Honor. In the second brief, they've come out for the first time in their SIR reply and said there should be no injunction at all because we don't have any products of infringement. I think that would be a remarkable conclusion from the perspective of trademark law. It would mean we've found infringement as a matter of law, but there are no damages and there is no injunction, we're going to let consumers be confused. This court should not permit that. Several quick responses. As an example of something that's not in the record, where's the moldy cheese in the record? There's a reference to moldy cheese. There's a sale or could be a sale of moldy cheese and that would harm the reputation. The answer is there's no evidence related to any defective or harmful product, number one. Number two, no, there was no argument made in connection with the injunction that we would like the court to issue an injunction that would not issue an injunction that would deal with likelihood of confusion and products. Our point is, where's the decision about whether there's a likelihood of confusion with respect to champagne or any other food product? What's the basis for that? It's overwhelmingly too broad without any justification for an injunction that covers all food. How about yogurt? That's in the same aisle. Well, Your Honor, the example, and by the way, I just have to say this, one of my colleagues used that as an example and asked me the same question, so I have to thank the court. I commend your colleague for a good mood court question. I will, he did, and I'll give you my answer. My answer is we can give cross examples for each one and the point will be, what does the injunction appropriately cover? What about sherbet? What about champagne? What about cookies? What about, you know, any other product? That's the point. There's no basis in this order that prohibits the use of magnolia for all food products. Does San Miguel have to deal with the threat of contempt? What's the appropriate protection area? I mean, your client has been found to have infringed. Right. So you escape with regard to the butter, margarine, and cheese because of latches, but that's not a get out of jail free card. There's some fair area where trademark law is supposed to protect the trademark which is owned by a ramar. What's that fair area? Well, my answer would be, Your Honor, without having to concede anything, that's exactly the analysis the district court should undertake and hasn't done at all. And there could be arguments based upon the law, the facts, these specific parties, and that didn't happen here. So you're basically saying food, all products too broad, food still too broad. Correct. And it could be determined for something. Of course. And that depends on a number of things which relate to the strength of the mark, the particular channels of marketing, etc. You're not entitled to a blanket injunction for all, it would be like all computers. Maybe Apple is entitled to an injunction that would be broader with respect to products and some other type of trademark or trademark owner. But the question the court is raising is exactly the point about why this injunction is unenforceable and inappropriate. We don't know the answer. So San Miguel is now operating under a contempt situation based solely upon an order that says all food products. It's entitled to notice. I mean, it's the basic principles of Rule 65. What does an injunction have to do? Tell you what's prohibited, coupled with Herb Reed. And let me mention one thing about the Herb Reed case. Loss of control. That was the traditional, one of the traditional arguments for an injunction. That's not the law anymore. You have to show past, past irreparable harm. That's what the eBay case talks about, past irreparable harm. As the court points out, there's no evidence, none of any past irreparable harm to Ramar. Why not? Because Ramar said at trial, these products don't compete. If they don't compete and there's an argument about, well, you know, I guess we could lose control, that's not enough to justify an injunction like the one entered in this case for all food products. The mystery about what it would apply to, what makes sense, that's the very reason it's got to be overturned by this court, because we don't know the answer to any of that. Thank you very much, Your Honor. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Nelson, Tashima, Clifton